IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Criminal Action No. |
| | ) | 08-00142-01-CR-W-SOW |
| JOSHUA RANDOLPH, | ) | |
| | ) | |
| Defendant. | ) | |

### REPORT AND RECOMMENDATION TO DENY
### DEFENDANT'S MOTION TO SUPPRESS EVIDENCE

Before the court is defendant's motion to suppress evidence seized from his vehicle and his person on May 21, 2008, on the grounds that (1) police did not have reasonable suspicion to justify the stop, and (2) the search of defendant's vehicle was illegal. I find that defendant's arrest was supported by probable cause, he had no standing to challenge the search of the car, and even if he had standing the search of the car was a valid search incident to arrest. Therefore, defendant's motion to suppress evidence should be denied.

*I. BACKGROUND*

On May 22, 2008, a complaint was filed charging defendant with possessing a firearm after having been convicted of a felony, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2). On June 3, 2008, an indictment was returned charging the same offense.

On December 12, 2008, defendant filed a motion to suppress (document number 26) arguing that there was no reasonable suspicion to detain defendant, and the subsequent search of his vehicle was conducted without a warrant and without any exception to the warrant requirement.

On December 19, 2008, the government filed a response (document number 28) arguing that officers observed defendant drinking in public and committing a traffic violation, both of which justified defendant's detention; and defendant's car was lawfully searched contemporaneously with his arrest.

On January 7, 2009, I held an evidentiary hearing on defendant's motion to suppress. The government appeared by Assistant United States Attorney Rudolph Rhodes, IV. The defendant was present, represented by Assistant Federal Public Defender William Raymond. The following witnesses testified:

1. Detective Donald Stanze, Kansas City, Missouri, Police Department

2. Officer Kenny Miller, Kansas City, Missouri, Police Department

3. Sergeant John Bryant, Kansas City, Missouri, Police Department

In addition, the following exhibits were marked and admitted into evidence:

P. Ex. 1   DVD from the patrol car taping of the May 21, 2008 arrest

P. Ex. 2   General Ordinance Summons for drinking in public, issued to defendant

P. Ex. 3   Uniform Traffic Ticket for pulling to the curb
           without signaling, issued to defendant

P. Ex. 4   Lists of property recovered from the search of
           defendant's vehicle

At the conclusion of the hearing, defense counsel requested seven days to provide a stipulation dealing with Detective Stanze's testimony during the preliminary hearing and to provide supplemental briefing (Tr. at 100-103). On January 28, 2009, defendant filed his supplemental suggestions (document number 36), and on February 5, 2009, the government filed its response to defendant's supplemental suggestions (document number 40).

## *II.  EVIDENCE*

On the basis of the evidence presented at the suppression hearing, I submit the following findings of fact:

1.  On May 21, 2008, at about 2:50 p.m. Detective Don Stanze and Detective Mike Miller were conducting surveillance in an unrelated case in the area of 36th and Prospect when they saw a gold Chevrolet Monte Carlo (Tr. at 7, 18). Detective Stanze knew from previous investigations who the owner of the car was, and he recognized defendant as the driver (Tr. at 7-8, 18). About three or four months earlier, a confidential informant had given Detective Stanze information that defendant was a person known to the informant to sell crack cocaine and carry a handgun (Tr. at 8, 19). The informant said defendant was selling crack cocaine from a residence around 36th and Askew (Tr. at 8).

3

Detective Stanze knew the car belonged to a female known to be a PCP dealer (Tr. at 8, 25). At least one passenger was in the car with defendant, but Detective Stanze could not identify that person (Tr. at 8-9).

2. Several months earlier when Detective Stanze first got information about defendant from the informant, he obtained a photograph of defendant (Tr. at 19). He did some surveillance at the residence at 36th ad Askew, and he checked for vehicle license plates (Tr. at 19). The confidential informant tried to set up a buy from defendant, but the buy did not go through (Tr. at 20-21).

3. Detective Stanze decided to follow the Monte Carlo (Tr. at 9). Defendant drove to a residence at 3507 Brooklyn in Kansas City (Tr. at 9, 21). Detective Stanze had received information a month or two earlier that PCP was being sold out of 3507 Brooklyn (Tr. at 9, 23). After obtaining the information, law enforcement had attempted to make a drug purchase from this residence, but had not been successful (Tr. at 24). Defendant went into the enclosed porch area of the house, and a couple minutes later he came back out and left in the car (Tr. at 10, 21-23).

4. Detective Stanze followed the car to a residence at 3314 Prospect (Tr. at 10, 26, 29-30). He observed defendant exit the vehicle, loiter on the sidewalk, talk with the occupants of two different vehicles that pulled up to the curb, and continue

4

to loiter in the driveway/street area for another 30 minutes (Tr. at 10-11, 28). While defendant was loitering on the sidewalk and in the street, he was drinking a Colt 45 Malt Liquor (Tr. at 11, 26-27, 30). It is a violation of a city ordinance to drink in public (Tr. at 11). Detective Stanze believed defendant was making drug sales to the individuals who had pulled up to the curb (Tr. at 11, 28). He did not believe defendant was intoxicated (Tr. at 30-31).

    5. At about 3:25 p.m., defendant got back in the car (Tr. at 11-12). Detective Mike Miller, who was with Detective Stanze, observed a passenger get into the car (Tr. at 32). The detectives watched defendant back out of the driveway onto Prospect and head south (Tr. at 11-12). Defendant pulled over to the curb at 35th and Prospect without using his turn signal, which is a traffic violation (Tr. at 12, 35). Other cars were parked on the side of the street near where defendant parked, and it is not illegal to park on that street (Tr. at 32, 57).

    6. Detective Stanze was talking to a patrol officer, Officer Kenny Miller, on his cell phone as he was following defendant, and he asked Officer Miller to stop the Monte Carlo due to defendant's drinking in public (Tr. at 12-13). While they were on the phone, Detective Stanze observed defendant pull to the curb without signaling, and he reported that to Officer Miller as well (Tr. at 35). He told Officer Kenny Miller that

5

defendant was known to carry a gun (Tr. at 14, 43). Just as Detective Stanze told Officer Kenny Miller that defendant had pulled to the side of the road, Officer Kenny Miller saw the Monte Carlo (Tr. at 42).

7. Both Officer Kenny Miller and Detective Stanze observed defendant exit the driver's side of the car about five to ten seconds before Officer Miller pulled up behind the Monte Carlo (Tr. at 13, 35, 42, 49; P. Ex. 1). At the time defendant exited his car, another car coming down Prospect had to pull around defendant's open car door, crossing the yellow line in the process (Tr. at 42, 57-58, 80). Detective Mike Miller, who was in the car with Detective Stanze, saw an unknown black male exit the passenger side of the car and walk away (Tr. at 36). Officer Kenny Miller activated his emergency lights which turned on the camera system in his patrol car (Tr. at 42). He had actually seen defendant talk for a moment to the person who had gotten out of the yellow car in front of him before heading across the street (Tr. at 59). When the two were talking, they were standing on the passenger side of the yellow car (Tr. at 60).

8. Officer Miller called out to defendant and asked him to come back to the car (Tr. at 43, 49; P. Ex. 1). Defendant said that was not his car (Tr. at 43; 49). Officer Miller said he saw defendant get out of that car, and defendant said it was not his car (Tr. at 43). Defendant said he got out of the "little yellow

6

car" (Tr. at 50). Officer Miller asked defendant to come back and place his hands on the car (Tr. at 43, 50). He conducted a pat-down search for weapons and got defendant's identification (Tr. at 43, 50, 63). Another officer, Todd Beard, arrived in a second car (he was actually only a car length or two behind Officer Miller), and Sergeant John Bryant also arrived on the scene about five to ten seconds later (Tr. at 44, 58, 84). Defendant was handcuffed and Officer Miller sat him down on the curb (Tr. at 44, 50, 63).

    9.    Sergeant Bryant telephoned Detective Stanze to get information about the situation, and one of the detectives said that they wanted defendant arrested for drinking in public and for a traffic violation and they wanted his car towed (Tr. at 85, 93). The detectives told Sergeant Bryant to be careful because defendant was usually armed with a firearm (Tr. at 86). Sergeant Bryant was going to have the car searched because it was going to be towed, but he was in no hurry to search the car since the tow trucks normally take about an hour to arrive (Tr. at 93-94).

    10.    Sergeant Bryant looked through the passenger side window of the Monte Carlo and observed a gun lying on the floorboard between the brake pedal and the gas pedal (Tr. at 45, 86, 93, 94). Sergeant Bryant informed Officer Miller about the gun, asked him if defendant was a felon to which Officer Miller said he thought defendant was, then Sergeant Bryant walked to the

7

driver's side of the car and tried to open the door (Tr. at 86, 90). The door was locked, but the window was down about four inches so Sergeant Bryant reached his hand inside the door to open it (Tr. at 86). He knelt down to inspect the gun, to make sure it was a real gun (Tr. at 86, 95). He looked at the weapon and "made sure it was loaded" (Tr. at 86-87). Sergeant Bryant did not make the gun safe by unloading it (Tr. at 87, 96). He picked it up, inspected it, made sure there were live rounds in the magazine, and put it back down so that the officer who was going to be writing the report could see where the gun had been located for his report (Tr. at 87, 96). Sergeant Bryant did not have gloves on when he picked up the gun (Tr. at 97).

    11. Sergeant Bryant also noticed the smell of PCP in the car (Tr. at 87). He opened the center console where he found numerous types of illegal drugs (Tr. at 87, 95).

    12. Sergeant Bryant walked to the front of the car and confirmed with Officer Miller, who had run a criminal history check on defendant, that defendant was a registered felon (Tr. at 45, 51, 87). Because of that and the firearm, he told Officer Miller to order a wagon to transport defendant to the detention center (Tr. at 87). He was placed under arrest for being a felon in possession of a firearm (Tr. at 87).

    13. Detective Stanze saw Officer Miller stop defendant and take him into custody (Tr. at 13-14). He and Detective Miller

8

watched the officer for about 15 minutes, then they left the area because the traffic was getting heavy (Tr. at 14, 37). The detectives talked to Sergeant Bryant by cell phone and wanted to know what kind of drugs had been found in the car (Tr. at 88). Sergeant Bryant went back to the Monte Carlo, reentered the car, and inventoried the narcotics that he had found earlier in the console (Tr. at 88, 89). He called the detectives to report the types of drugs in the car, and then waited with Officer Miller for the wagon to arrive to transport defendant to the jail (Tr. at 89). At no time did Sergeant Bryant unload the firearm (Tr. at 88).

14. A little later on, the driver of the yellow car returned to the scene (Tr. at 70). Officer Miller talked to him, and he said that he did not know defendant and had never seen him before (Tr. at 70-71).

15. Defendant did not have the keys to the Monte Carlo on his person, and they were not found inside the vehicle (Tr. at 38). At one point a female approached Officer Miller, claimed to be the owner of the Monte Carlo, and asked what was going to happen to it (Tr. at 62, 79). Officer Miller told her that the person who was driving it had been arrested and was going to jail, that the car had drugs in it, and it was going to be towed (Tr. at 62). The woman then walked away (Tr. at 62). Officer Miller did not get her name (Tr. at 62, 79).

9

16. Defendant was issued a ticket for drinking in public with a court date of July 21, 2008 (Tr. at 67; P. Ex. 2). He was also issued a ticket for failing to signal when pulling over to the curb with a court date of "mail in," meaning defendant could mail in the fine instead of appearing in court (Tr. at 67-68; P. Ex. 3).

17. The detectives eventually returned to the scene of defendant's arrest (Tr. at 15). Detective Stanze recovered from the vehicle a High Point .380 semi-automatic handgun, crack cocaine, powder cocaine, PCP, marijuana, and documents in the name of Joshua Randolph (Tr. at 15-16). The drugs were in the center console (Tr. at 16). The gun was on the driver's floorboard (Tr. at 16). Once the search of the vehicle was complete, the car was towed (Tr. at 16).

18. Sometime later, police learned that the residence where defendant spent 30 minutes loitering belongs to either his mother or his grandmother (Tr. at 26, 30). They did not know this on May 21, 2008 (Tr. at 28-30).

19. According to Officer Miller, the policy of the Kansas City, Missouri, Police Department with regard to whether to tow a vehicle is that it is entirely in the officer's discretion (Tr. at 74). Officer Miller's "own personal policy is that the car always gets towed." (Tr. at 74). Officer Miller said that if the

car is parked legally and can be secured, it could be left there, but that his personal policy is to tow everything (Tr. at 79).

20.  According to Sergeant Bryant, the policy of the Kansas City, Missouri, Police Department with regard to whether to tow a vehicle is that if the car is parked on a public street, the officer can decide to tow it, let the owner sign an authorization not to tow, or allow the person to have someone come pick up the vehicle (Tr. at 98-99).  "[W]e can tow any vehicle that we place an individual under arrest for." (Tr. at 99).

### *III. DEFENDANT'S STOP*

Defendant argues that he was stopped without sufficient reasonable suspicion.

A law enforcement officer who observes a traffic offense, however minor, has probable cause to stop the driver of a vehicle.  United States v. Williams, 429 F.3d 767 (8th Cir. 2005); United States v. Barragan, 379 F.3d 524, 528 (8th Cir. 2004); United States v. Mallari, 334 F.3d 765, 766 (8th Cir. 2003); United States v. Jones, 275 F.3d 673, 680 (8th Cir. 2001); United States v. Woodall, 938 F.2d 834 (8th Cir. 1991); United States v. Cortez, 935 F.2d 135, 142 (8th Cir. 1991).  A law enforcement officer can even lawfully stop an automobile merely to warn the driver of a traffic violation.  United States v. Webb, 533 F.2d 391 (8th Cir. 1976); United States v. Geelan, 509

11

F.2d 737, 743-44 (8th Cir. 1974), cert. denied, 421 U.S. 999 (1975).

Stopping a vehicle for failing to signal before turning is permitted. United States v. Davis, 457 F.3d 817, 821-822 (8th Cir. 2006), cert. denied, 127 S. Ct. 1386 (2007); United States v. Rodriguez-Lopez, 444 F.3d 1020, 1023 (8th Cir. 2006). Even if the driver has stopped the car and exited the vehicle before the officer has an opportunity to make the stop, the officer can still stop the individual on foot for the traffic offense. Thornton v. United States, 541 U.S. 615 (2004).

Defendant argues that the police unlawfully stopped defendant because they believed he was selling drugs and they had no evidence of drug trafficking. To determine whether a stop is pretextual, an objective assessment of the officer's actions must be made. Woodall, 938 F.2d at 837; Cortez, 935 F.2d at 142. In this case, the detectives who first observed defendant were interested in gathering whatever evidence there may be that defendant was selling drugs. Despite that, Officer Miller had an objective and legitimate reason to stop defendant. See Cortez, 935 F.2d at 142. An otherwise valid traffic stop would not be rendered invalid by the fact that it was a mere pretext for a search for something else, such as evidence of illegal drug transactions. Whren v. United States, 517 U.S. 806, 812-13 (1996)(citing United States v. Robinson, 414 U.S. 218, 221 n. 1

12

(1973)); United States v. Williams, 429 F.3d 767; United States v. Martinez, 358 F.3d 1005, 1009 (8th Cir. 2004); United States v. Woodall, 938 F.2d at 837.

Because Officer Miller had a legitimate reason for stopping defendant, defendant's motion to suppress on the ground that the stop was pretextual should be denied.

## IV.  STANDING TO CHALLENGE SEARCH OF CAR

The government argues that defendant has no standing to challenge the search of the car because he was not the owner and he denied that he had been in the car.

A criminal defendant cannot assert a privacy interest on behalf of someone else. United States v. Mendoza, 438 F.3d 792, 795 (7th Cir. 2006). Rather, a defendant charged with a crime of possession can only claim the benefits of the exclusionary rule if his own Fourth Amendment rights have been violated. United States v. Salvucci, 448 U.S. 83 (1980); United States v. Muhammad, 58 F.3d 353, 355 (8th Cir. 1995); cert. denied, 503 U.S. 983 (1992). A driver who borrows a car with the owner's permission may acquire standing to challenge the search of the vehicle only if he can establish that he has a legitimate expectation of privacy in it or in the area searched. United States v. Amaral-Estrada, 509 F.3d 820, 826 (7th Cir. 2007), cert. denied, 128 S. Ct. 1728 (2008). A reasonable expectation of privacy is present when (1) the defendant exhibits an actual

13

or subjective expectation of privacy, and (2) the expectation is one that society is prepared to recognize as reasonable. Katz v. United States, 389 U.S. 347, 361 (1967); United States v. Muhammad, 58 F.3d at 355.

In United States v. Amaral-Estrada, 509 F.3d at 827, the defendant was using someone else's car to transport more than a quarter million dollars in cash connected to cocaine transactions. Police observed him drive the car, park the car, and exit the car. About 15 minutes after he had exited the car, police approached him, and he denied owning the car or having been inside the car. The court of appeals held that Amaral-Estrada had no legitimate expectation of privacy in the car:

> [W]hen the federal agents asked Amaral-Estrada about the vehicle, Amaral-Estrada denied any knowledge of the car. Amaral-Estrada also testified that he did not care about the bag in the back seat of the Chrysler M300 because it was not his bag and not his car. Under these facts reasonably relied upon by the district court, Amaral-Estrada failed to exhibit any legitimate privacy interest in the Chrysler M300 and therefore lacks standing to challenge the search of the vehicle.

Id. at 827.

In this case, when defendant was approached by Officer Miller, defendant repeatedly said that he had not gotten out of the gold Monte Carlo, that he had gotten out of the little yellow car parked in front of the Monte Carlo. Defendant was not the owner of the Monte Carlo.

14

Because defendant was not the owner of the car and denied having been in the car, he did not exhibit any legitimate privacy interest in the car and therefore lacks standing to challenge the search of the car.

## V.   SEARCH OF THE CAR

Even if defendant had standing to challenge the search of the Monte Carlo, he would not be entitled to suppression of the items seized from within.  Police had authority to search the car both incident to defendant's arrest and prior to the car being towed.

In New York v. Belton, 453 U.S. 454, 460 (1981), the Supreme Court held that "when a policeman had made a lawful custodial arrest of the occupant of an automobile, he may, as a contemporaneous incident of that arrest, search the passenger compartment of that automobile."  Belton built on United States v. Robinson, 414 U.S. 218, 235 (1973), which held that a lawful custodial arrest establishes authority to conduct a full search of the arrestee's person, and that such a search is "not only an exception to the warrant requirement of the Fourth Amendment, but is also a 'reasonable' search under that Amendment."  Robinson observed that a lawful custodial arrest, involving "the taking of a suspect into custody and transporting him to the police station," creates extended exposure to the arrestee that presents heightened danger to the arresting officer.  Id.  While the

15

authority to search was "based upon the need to disarm and to discover evidence," the Court held that this authority "does not depend on what a court may later decide was the probability in a particular arrest situation that weapons or evidence would in fact be found upon the person of the suspect." Id.

Belton similarly rejected the contention that "'there must be litigated in each case the issue of whether or not there was present one of the reasons'" supporting a search incident to arrest. 453 U.S. at 459 (quoting Robinson, 414 U.S. at 235). The Court sought to establish a "workable rule" for this category of cases, because "[w]hen a person cannot know how a court will apply a settled principle to a recurring factual situation, that person cannot know the scope of his constitutional protection, nor can a policeman know the scope of his authority." Id. at 459-60. Thus, in the case of a full custodial arrest of an "occupant" or "recent occupant" of a vehicle, id. at 460, the police may search the passenger compartment of the vehicle as "a contemporaneous incident" of that arrest. Such a search to ensure safety and to preserve evidence is "reasonable" under the Fourth Amendment. Thornton v. United States, 541 U.S. 615, 623 (2004). "The need for a clear rule, readily understood by police officers and not depending on differing estimates of what items were or were not within reach of an arrestee at any particular

Case 4:08-cr-00142-BCW   Document 41   Filed 02/12/09   Page 16 of 20

moment, justifies the sort of generalization which <u>Belton</u> enunciated." <u>Id</u>. at 622-23.

Applying the <u>Belton</u> rule, the Eighth Circuit has upheld searches of automobiles incident to arrest where the arrestee has exited the vehicle and has been handcuffed and placed in a police officer's patrol car, e.g., <u>United States v. Barnes</u>, 374 F.3d 601, 603 (8th Cir. 2004), or even removed from the scene entirely. <u>United States v. Snook</u>, 88 F.3d 605, 606-08 (8th Cir. 1996); <u>United States v. McCrady</u>, 774 F.2d 868, 871-72 (8th Cir. 1985). Because <u>Belton</u> established a "bright-line rule" permitting searches regardless of whether there is actual concern for safety or evidence in a particular case, the analysis in these decisions has focused on whether the search is "roughly contemporaneous with the arrest" or conducted within a "reasonable time" after obtaining control of the vehicle. E.g., <u>United States v. Hrasky</u>, 453 F.3d 1099, 1101 (8th Cir. 2006).

The facts of this case are almost identical to those in <u>Thornton v. United States</u>, 541 U.S. 615 (2004). In that case a police officer became suspicious when the driver of the car next to him slowed down in order to avoid pulling next to him. The officer pulled off the road and called in the license plates of the Lincoln Town Car. The report came back that the plates were registered to a Chevrolet coup, not a Lincoln Town Car. Before the officer had an opportunity to pull the car over, Thornton

17

drove into a parking lot, parked, and got out of the Lincoln. The officer saw Thornton leave the Lincoln as the patrol car pulled up behind him. The officer confronted Thornton and asked for his driver's license. Thornton appeared nervous, so the officer frisked him and felt a bulge in his pocket. He asked Thornton if he had anything illegal, and Thornton said he did, reached into his pocket, and pulled out some marijuana and cocaine. The officer put Thornton in the back of the patrol car and then searched the Lincoln, finding a handgun under the driver's seat.

In upholding the search of the Lincoln incident to Thornton's arrest, the Supreme Court said:

> In all relevant aspects, the arrest of a suspect who is next to a vehicle presents identical concerns regarding officer safety and the destruction of evidence as the arrest of one who is inside the vehicle. An officer may search a suspect's vehicle under Belton only if the suspect is arrested. A custodial arrest is fluid and "[t]he danger to the police officer flows from *the fact of the arrest*, and its attendant proximity, stress, and uncertainty. . . . The stress is no less merely because the arrestee exited his car before the officer initiated contact, nor is an arrestee less likely to attempt to lunge for a weapon or to destroy evidence if he is outside of, but still in control of, the vehicle. In either case, the officer faces a highly volatile situation. It would make little sense to apply two different rules to what is, at bottom, the same situation.

Id. at 621 (emphasis in the original) (citations omitted).

The Court acknowledged that it was unlikely that Thornton could have reached under the driver's seat for his gun once he was outside his automobile. "The need for a clear rule, readily

18

understood by police officers and not depending on different estimates of what items were or were not within reach of an arrestee at any particular moment, justifies the sort of generalization which Belton enunciated. Once an officer determines that there is probable cause to make an arrest, it is reasonable to allow officers to ensure their safety and to preserve evidence by searching the entire passenger compartment." Id. at 622-23.

In this case, Officer Miller had probable cause to arrest defendant for (1) drinking in public, (2) pulling to the curb without using his turn signal, (3) opening his car door in traffic causing a car to cross the yellow line into oncoming traffic, and (4) being a felon in possession of a firearm. Defendant was originally detained by Officer Miller for the first three offenses. Before the car was searched, however, Sergeant Bryant saw through the car window a firearm lying in plain view on the floor. A criminal history check had confirmed that defendant had a felony conviction. Therefore, because police had probable cause to arrest defendant on four different offenses, and because he had just exited the Monte Carlo before the encounter with Officer Miller, the police were justified in searching the passenger compartment of the Monte Carlo incident to defendant's arrest.

19

## VI. CONCLUSION

Based on the above-stated findings of fact and the law as discussed in sections III through V, I conclude that Officer Miller lawfully stopped defendant; defendant had no standing to challenge the search of the Monte Carlo; and even if defendant had standing to challenge the search, the car was lawfully searched incident to defendant's arrest. Therefore, it is

RECOMMENDED that the court, after making an independent review of the record and the applicable law, enter an order denying defendant's motion to suppress evidence and his subsequent statements.[1]

Counsel are advised that, pursuant to 28 U.S.C. § 636(b)(1), each has ten days from the date of this report and recommendation to file and serve specific objections.

/s/ Robert E. Larsen
ROBERT E. LARSEN
United States Magistrate Judge

Kansas City, Missouri
February 11, 2009

---

[1] Defendant's motion to suppress statements is based entirely on a "fruit of the poisonous tree" theory. Because the stop and search were constitutional, there is no "poisonous tree."