IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

UNITED STATES OF AMERICA,      )
                               )
          Plaintiff,           )
                               )
     v.                        )     Criminal Action No.
                               )     08-00142-01-CR-W-SOW
JOSHUA P. RANDOLPH,            )
                               )
          Defendant.           )

**REPORT AND RECOMMENDATION TO DENY
DEFENDANT'S RENEWED MOTION TO SUPPRESS**

Before the court is defendant's renewed motion to suppress
evidence seized from defendant's car on May 21, 2008, in light of
the Supreme Court's holding in <u>Arizona v. Gant</u>, 129 S. Ct. 1710
(2009).  I find that (1) defendant lacks standing to challenge
the search of the car, and (2) even if he had standing to
challenge the search, the search was a lawful search incident to
arrest even under the newly-stated requirements of <u>Arizona v.
Gant</u>.

*I.*   *BACKGROUND*

On May 22, 2008, a complaint was filed charging defendant
with possessing a firearm after having been convicted of a
felony, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2).  On
June 3, 2008, an indictment was returned charging the same
offense.

On December 12, 2008, defendant filed a motion to suppress
(document number 26) arguing that there was no reasonable

suspicion to detain defendant, and the subsequent search of his vehicle was conducted without a warrant and without any exception to the warrant requirement.

On December 19, 2008, the government filed a response (document number 28) arguing that officers observed defendant drinking in public and committing a traffic violation, both of which justified defendant's detention; and defendant's car was lawfully searched contemporaneously with his arrest.

On January 7, 2009, I held an evidentiary hearing on defendant's motion to suppress. At the conclusion of the hearing, defense counsel requested seven days to provide a stipulation dealing with Detective Stanze's testimony during the preliminary hearing and to provide supplemental briefing. On January 28, 2009, defendant filed his supplemental suggestions (document number 36), and on February 5, 2009, the government filed its response to defendant's supplemental suggestions (document number 40).

I issued a Report and Recommendation on February 12, 2009 (document number 41) finding that defendant's arrest was supported by probable cause; he had no standing to challenge the search of the car; and even if he had standing, the search of the car was a valid search incident to arrest. Defendant filed objections on February 23, 2009 (document number 43). District Judge Scott Wright entered an Order on February 26, 2009,

adopting the Report and Recommendation (document number 44).

On March 25, 2009, defendant filed a notice of his reservation of the right to appeal the suppression decision (document number 48). That same day he entered a conditional guilty plea.

On April 21, 2009, the Supreme Court handed down its decision in <u>Arizona v. Gant</u>, 129 S. Ct. 1710 (2009). In that case, the Supreme Court held that police may search a vehicle incident to arrest if (1) the arrestee is within reaching distance of the passenger compartment at the time of the search, or (2) it is reasonable to believe that the vehicle contains evidence of the offence of arrest. On October 8, 2009, defendant filed a motion to reconsider his suppression motion in light of this new case (document number 54). On October 21, 2009, the government filed its response to defendant's renewed motion (document number 56). The government points out that the court found that defendant lacks standing to challenge the search of the car, and the new Supreme Court case does nothing to disturb that finding. Additionally, the government argues that even if defendant had standing, the search would still be permissible because the police had probable cause to arrest defendant for being a felon in possession of a firearm prior to the car being searched, and that having seen a firearm in the car it was

reasonable to believe that the vehicle contained evidence of a weapons offense at the time of the search.

## II. EVIDENCE

Below are the original findings of fact which were adopted by the district judge:

1. On May 21, 2008, at about 2:50 p.m. Detective Don Stanze and Detective Mike Miller were conducting surveillance in an unrelated case in the area of 36th and Prospect when they saw a gold Chevrolet Monte Carlo (Tr. at 7, 18).[1] Detective Stanze knew from previous investigations who the owner of the car was, and he recognized defendant as the driver (Tr. at 7-8, 18). About three or four months earlier, a confidential informant had given Detective Stanze information that defendant was a person known to the informant to sell crack cocaine and carry a handgun (Tr. at 8, 19). The informant said defendant was selling crack cocaine from a residence around 36th and Askew (Tr. at 8). Detective Stanze knew the car belonged to a female known to be a PCP dealer (Tr. at 8, 25). At least one passenger was in the car with defendant, but Detective Stanze could not identify that person (Tr. at 8-9).

2. Several months earlier when Detective Stanze first got information about defendant from the informant, he obtained a

---

[1]"Tr." refers to the page of the transcript of the suppression hearing, document number 33.

4

photograph of defendant (Tr. at 19).  He did some surveillance at the residence at 36th and Askew, and he checked for vehicle license plates (Tr. at 19).  The confidential informant tried to set up a buy from defendant, but the buy did not go through (Tr. at 20-21).

3.    Detective Stanze decided to follow the Monte Carlo (Tr. at 9).  Defendant drove to a residence at 3507 Brooklyn in Kansas City (Tr. at 9, 21).  Detective Stanze had received information a month or two earlier that PCP was being sold out of 3507 Brooklyn (Tr. at 9, 23).  After obtaining the information, law enforcement had attempted to make a drug purchase from this residence, but had not been successful (Tr. at 24).  Defendant went into the enclosed porch area of the house, and a couple minutes later he came back out and left in the car (Tr. at 10, 21-23).

4.    Detective Stanze followed the car to a residence at 3314 Prospect (Tr. at 10, 26, 29-30).  He observed defendant exit the vehicle, loiter on the sidewalk, talk with the occupants of two different vehicles that pulled up to the curb, and continue to loiter in the driveway/street area for another 30 minutes (Tr. at 10-11, 28).  While defendant was loitering on the sidewalk and in the street, he was drinking a Colt 45 Malt Liquor (Tr. at 11, 26-27, 30).  It is a violation of a city ordinance to drink in public (Tr. at 11).  Detective Stanze believed defendant was making drug sales to the individuals who had pulled up to the

5

curb (Tr. at 11, 28). He did not believe defendant was
intoxicated (Tr. at 30-31).

5. At about 3:25 p.m., defendant got back in the car (Tr.
at 11-12). Detective Mike Miller, who was with Detective Stanze,
observed a passenger get into the car (Tr. at 32). The
detectives watched defendant back out of the driveway onto
Prospect and head south (Tr. at 11-12). Defendant pulled over to
the curb at 35th and Prospect without using his turn signal,
which is a traffic violation (Tr. at 12, 35). Other cars were
parked on the side of the street near where defendant parked, and
it is not illegal to park on that street (Tr. at 32, 57).

6. Detective Stanze was talking to a patrol officer,
Officer Kenny Miller, on his cell phone as he was following
defendant; and he asked Officer Miller to stop the Monte Carlo
due to defendant's drinking in public (Tr. at 12-13). While they
were on the phone, Detective Stanze observed defendant pull to
the curb without signaling, and he reported that to Officer
Miller as well (Tr. at 35). He told Officer Kenny Miller that
defendant was known to carry a gun (Tr. at 14, 43). Just as
Detective Stanze told Officer Kenny Miller that defendant had
pulled to the side of the road, Officer Kenny Miller saw the
Monte Carlo (Tr. at 42).

7. Both Officer Kenny Miller and Detective Stanze observed
defendant exit the driver's side of the car about five to ten

6

seconds before Officer Miller pulled up behind the Monte Carlo (Tr. at 13, 35, 42, 49; P. Ex. 1). At the time defendant exited his car, another car coming down Prospect had to pull around defendant's open car door, crossing the yellow line in the process (Tr. at 42, 57-58, 80). Detective Mike Miller, who was in the car with Detective Stanze, saw an unknown black male exit the passenger side of the car and walk away (Tr. at 36). Officer Kenny Miller activated his emergency lights which turned on the camera system in his patrol car (Tr. at 42). He had actually seen defendant talk for a moment to the person who had gotten out of the yellow car in front of him before heading across the street (Tr. at 59). When the two were talking, they were standing on the passenger side of the yellow car (Tr. at 60).

8. Officer Miller called out to defendant and asked him to come back to the car (Tr. at 43, 49; P. Ex. 1). Defendant said that was not his car (Tr. at 43, 49). Officer Miller said he saw defendant get out of that car, and defendant said it was not his car (Tr. at 43). Defendant said he got out of the "little yellow car" (Tr. at 50). Officer Miller asked defendant to come back and place his hands on the car (Tr. at 43, 50). He conducted a pat-down search for weapons and got defendant's identification (Tr. at 43, 50, 63). Another officer, Todd Beard, arrived in a second car (he was actually only a car length or two behind Officer Miller), and Sergeant John Bryant also arrived on the

scene about five to ten seconds later (Tr. at 44, 58, 84). Defendant was handcuffed and Officer Miller sat him down on the curb (Tr. at 44, 50, 63).

9.     Sergeant Bryant telephoned Detective Stanze to get information about the situation, and one of the detectives said that they wanted defendant arrested for drinking in public and for a traffic violation and they wanted his car towed (Tr. at 85, 93).  The detectives told Sergeant Bryant to be careful because defendant was usually armed with a firearm (Tr. at 86).  Sergeant Bryant was going to have the car searched because it was going to be towed, but he was in no hurry to search the car since the tow trucks normally take about an hour to arrive (Tr. at 93-94).

10.     Sergeant Bryant looked through the passenger side window of the Monte Carlo and observed a gun lying on the floorboard between the brake pedal and the gas pedal (Tr. at 45, 86, 93, 94).  Sergeant Bryant informed Officer Miller about the gun, asked him if defendant was a felon to which Officer Miller said he thought[2] defendant was, then Sergeant Bryant walked to the driver's side of the car and tried to open the door (Tr. at 86, 90).  The door was locked, but the window was down about four inches so Sergeant Bryant reached his hand inside the door to open it (Tr. at 86).  He knelt down to inspect the gun, to make sure it was a real gun (Tr. at 86, 95).  He looked at the weapon

---

[2]See footnote 4, page 21, of this order.

and "made sure it was loaded" (Tr. at 86-87). Sergeant Bryant did not make the gun safe by unloading it (Tr. at 87, 96). He picked it up, inspected it, made sure there were live rounds in the magazine, and put it back down so that the officer who was going to be writing the report could see where the gun had been located for his report (Tr. at 87, 96). Sergeant Bryant did not have gloves on when he picked up the gun (Tr. at 97).

11. Sergeant Bryant also noticed the smell of PCP in the car (Tr. at 87). He opened the center console where he found numerous types of illegal drugs (Tr. at 87, 95).

12. Sergeant Bryant walked to the front of the car and confirmed with Officer Miller, who had run a criminal history check on defendant, that defendant was a registered felon (Tr. at 45, 51, 87). Because of that and the firearm, he told Officer Miller to order a wagon to transport defendant to the detention center (Tr. at 87). He was placed under arrest for being a felon in possession of a firearm (Tr. at 87).

13. Detective Stanze saw Officer Miller stop defendant and take him into custody (Tr. at 13-14). He and Detective Miller watched the officer for about 15 minutes, then they left the area because the traffic was getting heavy (Tr. at 14, 37). The detectives talked to Sergeant Bryant by cell phone and wanted to know what kind of drugs had been found in the car (Tr. at 88). Sergeant Bryant went back to the Monte Carlo, reentered the car,

and inventoried the narcotics that he had found earlier in the console (Tr. at 88, 89).  He called the detectives to report the types of drugs in the car, and then waited with Officer Miller for the wagon to arrive to transport defendant to the jail (Tr. at 89).  At no time did Sergeant Bryant unload the firearm (Tr. at 88).

14.  A little later on, the driver of the yellow car returned to the scene (Tr. at 70).  Officer Miller talked to him, and he said that he did not know defendant and had never seen him before (Tr. at 70-71).

15.  Defendant did not have the keys to the Monte Carlo on his person, and they were not found inside the vehicle (Tr. at 38).  At one point a female approached Officer Miller, claimed to be the owner of the Monte Carlo, and asked what was going to happen to it (Tr. at 62, 79).  Officer Miller told her that the person who was driving it had been arrested and was going to jail, that the car had drugs in it, and it was going to be towed (Tr. at 62).  The woman then walked away (Tr. at 62).  Officer Miller did not get her name (Tr. at 62, 79).

16.  Defendant was issued a ticket for drinking in public with a court date of July 21, 2008 (Tr. at 67; P. Ex. 2).  He was also issued a ticket for failing to signal when pulling over to the curb with a court date of "mail in," meaning defendant could mail in the fine instead of appearing in court (Tr. at 67-68; P.

Ex. 3).

17.    The detectives eventually returned to the scene of defendant's arrest (Tr. at 15).  Detective Stanze recovered from the vehicle a High Point .380 semi-automatic handgun, crack cocaine, powder cocaine, PCP, marijuana, and documents in the name of Joshua Randolph (Tr. at 15-16).  The drugs were in the center console (Tr. at 16).  The gun was on the driver's floorboard (Tr. at 16).  Once the search of the vehicle was complete, the car was towed (Tr. at 16).

18.    Sometime later, police learned that the residence where defendant spent 30 minutes loitering belongs to either his mother or his grandmother (Tr. at 26, 30).  They did not know this on May 21, 2008 (Tr. at 28-30).

19.    According to Officer Miller, the policy of the Kansas City, Missouri, Police Department with regard to whether to tow a vehicle is that it is entirely in the officer's discretion (Tr. at 74).  Officer Miller's "own personal policy is that the car always gets towed." (Tr. at 74).  Officer Miller said that if the car is parked legally and can be secured, it could be left there, but that his personal policy is to tow everything (Tr. at 79).

20.    According to Sergeant Bryant, the policy of the Kansas City, Missouri, Police Department with regard to whether to tow a vehicle is that if the car is parked on a public street, the officer can decide to tow it, let the owner sign an authorization

not to tow, or allow the person to have someone come pick up the
vehicle (Tr. at 98-99). "[W]e can tow any vehicle that we place
an individual under arrest for." (Tr. at 99).

### III. STANDING TO CHALLENGE SEARCH OF CAR

The government points out that defendant does not have
standing to challenge the search of the Monte Carlo. That
defendant has no standing was adopted by the District Judge in
his Order and remains unchallenged. I find that because
defendant has no standing to challenge the search of the car, the
Supreme Court's recent decision has no bearing on this case.
Below I have restated this section from the Report and
Recommendation which was adopted by the District Judge.

> The government argues that defendant has no standing to
> challenge the search of the car because he was not the owner
> and he denied that he had been in the car.
>
> A criminal defendant cannot assert a privacy interest
> on behalf of someone else. United States v. Mendoza, 438
> F.3d 792, 795 (7th Cir. 2006). Rather, a defendant charged
> with a crime of possession can only claim the benefits of
> the exclusionary rule if his own Fourth Amendment rights
> have been violated. United States v. Salvucci, 448 U.S. 83
> (1980); United States v. Muhammad, 58 F.3d 353, 355 (8th
> Cir. 1995); cert. denied, 503 U.S. 983 (1992). A driver who
> borrows a car with the owner's permission may acquire
> standing to challenge the search of the vehicle only if he
> can establish that he has a legitimate expectation of
> privacy in it or in the area searched. United States v.
> Amaral-Estrada, 509 F.3d 820, 826 (7th Cir. 2007), cert.

denied, 128 S. Ct. 1728 (2008). A reasonable expectation of privacy is present when (1) the defendant exhibits an actual or subjective expectation of privacy, and (2) the expectation is one that society is prepared to recognize as reasonable. Katz v. United States, 389 U.S. 347, 361 (1967); United States v. Muhammad, 58 F.3d at 355.

In United States v. Amaral-Estrada, 509 F.3d at 827, the defendant was using someone else's car to transport more than a quarter million dollars in cash connected to cocaine transactions. Police observed him drive the car, park the car, and exit the car. About 15 minutes after he had exited the car, police approached him, and he denied owning the car or having been inside the car. The court of appeals held that Amaral-Estrada had no legitimate expectation of privacy in the car:

> [W]hen the federal agents asked Amaral-Estrada about the vehicle, Amaral-Estrada denied any knowledge of the car. Amaral-Estrada also testified that he did not care about the bag in the back seat of the Chrysler M300 because it was not his bag and not his car. Under these facts reasonably relied upon by the district court, Amaral-Estrada failed to exhibit any legitimate privacy interest in the Chrysler M300 and therefore lacks standing to challenge the search of the vehicle.

Id. at 827.

In this case, when defendant was approached by Officer Miller, defendant repeatedly said that he had not gotten out of the gold Monte Carlo, that he had gotten out of the little yellow car parked in front of the Monte Carlo. Defendant was not the owner of the Monte Carlo.

Because defendant was not the owner of the car and denied having been in the car, he did not exhibit any legitimate privacy interest in the car and therefore lacks standing to challenge the search of the car.

13

## IV.  *ARIZONA V. GANT*

Even if defendant had standing to challenge the search of his car, the result would be the same.

Searches conducted outside the judicial process, without prior approval by a judge or magistrate, are per se unreasonable under the Fourth Amendment, subject only to a few specifically established and well-delineated exceptions.  <u>Katz v. United States</u>, 389 U.S. 347, 357 (1967).  Among the exceptions to the warrant requirement is a search incident to a lawful arrest. <u>Weeks v. United States</u>, 232 U.S. 383, 392 (1914).  A search incident to arrest may only include the arrestee's person and the area within his immediate control, meaning the area from within which he might gain possession of a weapon or destructible evidence.  <u>Chimel v. California</u>, 395 U.S. 752 (1969).  When an officer lawfully arrests the occupant of an automobile, he may, as a contemporaneous incident of that arrest, search the passenger compartment of the automobile and any containers therein.  <u>New York v. Belton</u>, 453 U.S. 454, 460 (1981).

The <u>Belton</u> opinion "has been widely understood to allow a vehicle search incident to the arrest of a recent occupant even if there is no possibility the arrestee could gain access to the vehicle at the time of the search."  <u>Arizona v. Gant</u>, 129 S. Ct. 1710, 1718 (2009).  In <u>Belton</u>, a lone police officer stopped a speeding car in which Belton was one of four occupants.  The

14

officer smelled burned marijuana and observed an envelope on the
car floor marked "Supergold", a name he associated with
marijuana.  The officer ordered the four occupants out of the
vehicle, placed them under arrest, and split them into four
separate areas of the Thruway.  He only had one set of handcuffs;
therefore, the arrestees were not cuffed.  The officer then
searched the interior of the vehicle and discovered cocaine in
the pocket of a jacket on the back seat of the car.

     The United States, as *amicus curiae* in support of the State,
argued for a more permissive standard but maintained that any
search incident to arrest must be "substantially contemporaneous"
with the arrest -- a requirement it deemed "satisfied if the
search occurs during the period in which the arrest is being
consummated and before the situation has so stabilized that it
could be said that the arrest was completed."  The Supreme Court
held that "when an officer lawfully arrests 'the occupant of an
automobile, he may, as a contemporaneous incident of that arrest,
search the passenger compartment of the automobile' and any
containers therein."  <u>Arizona v. Gant</u>, 129 S. Ct. at 1717,
quoting <u>New York v. Belton</u>, 453 U.S. at 460.  Justice Brennan, in
his dissenting opinion, characterized the Court's holding as
resting on the "fiction . . . that the interior of a car is
<u>always</u> within the immediate control of an arrestee who has
recently been in the car" and that under the majority's approach,

'the result would presumably be the same even if [the officer] had handcuffed Belton and his companions in the patrol car" before conducting the search. <u>New York v. Belton</u>, 453 U.S. at 468. Subsequently, Courts of Appeals have predominantly adopted Justice Brennan's reading of the Court's opinion when facing the question whether a vehicle must be within the arrestee's reach to justify a vehicle search incident to arrest. <u>Arizona v. Gant</u>, 129 S. Ct. at 1718.

Subsequent to all of this, one Rodney Gant was arrested in Arizona for driving with a suspended license. He was handcuffed and locked in a patrol car before officers searched his car and found cocaine in a jacket pocket. The Arizona trial court denied his motion to suppress, but the State Supreme Court reversed. The case went to the United States Supreme Court which held that police may search the passenger compartment of a vehicle incident to a recent occupant's arrest only if it is reasonable to believe that the arrestee might access the vehicle at the time of the search or that the vehicle contains evidence of the offense of the arrest.

In the original Report and Recommendation in this case (which was adopted by the District Judge), I relied on <u>Thornton v. United States</u>, 541 U.S. 615, 623 (2004) which held that in the case of a full custodial arrest of an occupant or recent occupant of a vehicle, the police may search the passenger compartment of

the vehicle as a contemporaneous incident of that arrest; United States v. Barnes, 374 F.3d 601, 603 (8th Cir. 2004), which held that an automobile may be searched incident to arrest when the arrestee has exited the vehicle and has been handcuffed and placed in a police officer's patrol car; and United States v. Snook, 88 F.3d 605, 606-08 (8th Cir. 1996), and United States v. McCrady, 774 F.2d 868, 871-72 (8th Cir. 1985), which held that a search of a vehicle may be done incident to arrest even after the arrestee has been removed from the scene entirely. It appears, then, that under the facts of the present case, at least the Circuit Court authority cited above is no longer applicable in light of Arizona v. Gant.

Defendant was handcuffed and sitting on a curb, clearly outside the car and under the control of the police, when the police first entered the car and examined the gun. Therefore, the first justification for the search under Gant does not apply.

The second justification under Gant applies when the vehicle contains evidence of the offense of arrest.[3] The Supreme Court stated in Gant, "In many cases, as when a recent occupant is arrested for a traffic violation, there will be no reasonable basis to believe the vehicle contains relevant evidence. But in others, including Belton and Thornton, the offense of arrest will

_____

[3]The Court cited Thornton v. United States, 541 U.S. at 632 in support of this second justification.

supply a basis for searching the passenger compartment of an arrestee's vehicle and any containers therein." <u>Arizona v. Gant</u>, 129 S. Ct. at 1719.

In this case, Officer Kenny Miller, who arrested defendant and ran the criminal history check, testified as follows:

> A.   Well, in short, we sat him down on the curb. We was in phone contact with the detectives, who asked us to conduct the stop. They told us that they had probable cause for the stop. That they witnessed him drinking in public and the driving charging. And I further stated that I had witnessed him open the door into the street, so I said that was another charge. Sergeant Bryant then got in contact with him. It was the first time that he actually called the detectives because I had been in contact with the detectives. And Sergeant Bryant called the detectives. He was on the phone with them for a little bit getting the whole story. When he walked back up to me to let me know what was going on because we was in front of the gold Chevy, he, Sergeant Bryant, observed the handgun laying on the floorboard. And then at that point, it just fell into place, I guess. He went over the --

> Q.   Right. Was a criminal history check done on him?

> A.   I'm sorry?

> Q.   Criminal history? Did you run a criminal history check --

> A.   Yes.

> Q.   -- to see if he had any priors --

> A.   Yes.

> Q.   -- and what did you learn?

> A.   Actually, when I ran the computer check over the air, the dispatcher informed me that he was a registered felon. . . .

> Q.   And was he placed in custody?

A.    He was.

Q.    And was the vehicle then searched?

A.    It was. It was searched incident to arrest.

Q.    Okay. And who was [doing] the searching of it?

A.    The first one that searched it was Sergeant Bryant.
      He's the one that actually saw the gun. He went in
      through the driver's door. . . .

(Tr. at 44-45).

During the playing of a video of the arrest:

A.    Sergeant Bryant, . . . he got the detective's phone
      number from me, and he actually is now going back to
      make contact with the detectives.

Q.    Are you standing here with the defendant?

A.    I'm actually right there on the front of the car, yeah.

Q.    And at that point, Sergeant Bryant is on the phone?

A.    He is in contact with the detectives.

Q.    He's in contact?

A.    Yeah, because now it's, since he's the sergeant, he
      wanted to know what was going on, what we had, what the
      situation was.

Q.    Okay.

A.    (Video playing). And just as a reminder, during this
      time, while he's sitting on the curb, this is when I
      actually ran his name, got all the information. I ran
      this car, and I've also ran the little yellow car.

Q.    Did you obtain information --

A.    Yeah, that's all I'm doing on --

Q.    -- from headquarters?

A.    Uh-huh. To the dispatcher.

Q.    Okay. (Video playing). Now, you guys are out of view a
      little bit. Is he sitting on the sidewalk? Is the
      defendant sitting on the sidewalk?

A.    He's sitting on the curb right at the --

Q.    Sitting on the curb in front of the vehicle?

A.    Right in front of his vehicle, that's correct.

Q.    And you're standing up?

A.    I'm actually standing above him on the sidewalk.

Q.    (Video playing). At this point, did you learn --

A.    Yeah, it was actually probably a couple -- I thought
      you were going to stop, but I apologize.

Q.    No, go ahead.

A.    Probably 15:35 and 28 seconds, Sergeant Bryant walked
      up and he whispered in my ear that he observed a gun
      laying on the floorboard. And actually, he asked if he
      come back as a registered felon, and I answered yes.

THE COURT: Okay. Now, what are you doing there?

THE WITNESS: That's not me. That's actually Sergeant Bryant,
      sir.

MR. RHODES: That's Sergeant Bryant.

THE COURT: What's he doing?

THE WITNESS: He's unlocking the car door. Looks like he
      stuck his hands in the window there.

(Tr. at 32-34).

A.    He's in handcuffs sitting on the street, that's
      correct.

Q.    Okay.

A.    On the curb.

Q.    With at least one or maybe two officers around him?

A.     That's correct.

Q.     Okay. And you said, I think when Mr. Rhodes asked you, you said you guys searched that vehicle incident to arrest at that point in time?

A.     After the handgun was observed, yes.

Q.     Okay. And at that point in time what was he under arrest for?

A.     I'm sorry. I --

Q.     I just want to make sure what you were arresting him for at that point that you were searching the vehicle incident to arrest for.

A.     The handgun on the floorboard and the UTT and the GOS.

THE COURT: What's UTT and GOS?

THE WITNESS: Uniform Traffic Ticket. It would be for the detectives that observed him making the left turn without a signal and also the GOS for drinking in public, the General Order of Summons.

(Tr. at 64-65).

The evidence establishes that the police knew defendant was a convicted felon at the time Sergeant Bryant observed the firearm on the floorboard of defendant's car, and that defendant was under arrest for being a felon in possession of a handgun at the time Sergeant Bryant first entered defendant's vehicle.[4]

_____

[4]Sergeant Bryant testified as follows:

Q.     Did you also subsequently -- well, I have one more. Did you learn about his criminal history of him being a felon or not at the time?

A.     Yes, sir. Officer Miller had conducted a computer check, I believe of the individual, and said that he was a registered felon . . . .

Q.     Oh, okay. And he had communicated that to you?

A.     Yes. Officer Miller did.

Therefore, the second justification for searching the interior of defendant's car incident to his arrest, as announced by the Supreme Court in Arizona v. Gant, applies since it was reasonable to believe that the vehicle contained evidence (a firearm) of the offense of arrest (possessing a firearm after having been convicted of a felony).

## V. CONCLUSION

Based on all of the above, I find that (1) defendant lacks standing to challenge the search of the car, and (2) even if he had standing to challenge the search, the search was a lawful search incident to arrest even under the newly-stated requirements of Arizona v. Gant. Therefore, it is

RECOMMENDED that the court, after making an independent review of the record and the applicable law, enter an order

---

Q.   And roughly when did he told you that he had learned about his criminal history? Was that before you --
A.   After I saw -- to back up. After I saw the gun or what I thought was a gun laying up there, --
Q.   Uh-huh.
A.   -- I walked up and told Officer Miller, I said there's a gun on the floorboard. Is he a felon? And he goes, yeah, I think he is.
(Tr. at 90). Although Sergeant Bryant testified that Officer Miller said "I think he is", Officer Miller testified that he had already conducted the computer check prior to Sergeant Bryant reaching into the car. Therefore, I find that Officer Miller "knew" defendant was a felon rather than merely thinking he was a felon as Sergeant Bryant stated. Furthermore, it is unclear from Sergeant Bryant's testimony whether he intended to quote Officer Miller's response or rather was merely paraphrasing. In any event, the credible evidence establishes that Officer Miller formally checked to see if defendant was a felon before Sergeant Bryant reached into defendant's car.

denying defendant's renewed motion to suppress evidence.

Counsel are advised that, pursuant to 28 U.S.C. § 636(b)(1), each has 14 days from the date of this report and recommendation to file and serve specific objections.

/s/ Robert E. Larsen
ROBERT E. LARSEN
United States Magistrate Judge

Kansas City, Missouri
January 8, 2010